IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )

*ex rel.* CHARLES DONIGIAN,

                Plaintiff,

v.

ST. JUDE MEDICAL, INC.,

                Defendant.

CIVIL ACTION NO.
06 CA 11166 DPW

**FILED UNDER SEAL**

**PURSUANT TO**
**31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

## THIRD AMENDED FALSE CLAIMS ACT COMPLAINT

### INTRODUCTION

1.      CHARLES DONIGIAN ("Relator") brings this action on behalf of the UNITED

STATES OF AMERICA against ST. JUDE MEDICAL, INC. (hereinafter "SJM" or

"DEFENDANT") for treble damages and civil penalties arising from the DEFENDANT'S conduct

in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"). The

violations arise out of requests for payment made to Medicare, Medicaid, TRICARE, and other

government agencies and programs (hereinafter, collectively the "Government Healthcare

Programs") based on false or fraudulent claims, false statements, and illegal inducements and

kickbacks. He also brings personal claims alleging that DEFENDANT unlawfully retaliated against

him in his employment in violation of the Federal FCA and wrongfully discharged him in violation

of the laws of the State of Missouri where he resides.[1]

---

[1]Prior to serving this Third Amended Complaint on Defendant, the Relator intends to move for a voluntarily
dismissal with prejudice of the claims under certain State FCAs that are contained in his Second Amended

2.      This Complaint describes kickbacks provided by DEFENDANT to physicians, hospitals and other healthcare providers (hereinafter sometimes collectively referred to as "providers"), to induce them to prescribe certain medical products manufactured and sold by DEFENDANT, and also causing the providers to submit requests for payment for such products to Government Healthcare Programs.  These kickbacks took many forms including: (1) payments ostensibly for physician's collection of data and provision of services in connection with DEFENDANT'S post-market clinical studies which DEFENDANT knowingly and intentionally designed and used as a means of increasing sales of its devices over competitors, not as *bona fide* scientific research; and (2) payments for entertainment, travel,. conferences at luxury resorts, tickets to sporting events, and other gifts and benefits.

3.      The kickbacks achieved SJM's intended purpose.  Relator is aware of cases where physicians prescribed SJM devices because they were receiving kickbacks.  For a substantial portion of these patients and procedures, the physician or hospital then submitted reimbursement claims to Medicare and other Government Health Care Programs.

4.      Relator is informed and believes that the pervasive kickbacks, false statements and false or fraudulent claims described herein began at least six (6) years before the filing of this lawsuit.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this case pursuant to 31 U.S.C. § 3732(a) and 3730, as well as under 28 U.S.C. §§ 1331 and 1345, because SJM does business in the District of Massachusetts. This Court has supplemental jurisdiction over the state law claim brought on behalf

---

Complaint. However, pursuant to state laws, dismissal of some or all of those claims will require the approval of this Court and/or the State(s).

of the Relator for wrongful discharge under Missouri law pursuant to 28 U.S.C. § 1367.

6.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c), because SJM transacts business in this District.

## PARTIES

7.    Relator, CHARLES DONIGIAN is a resident of Missouri. He was employed by SJM as a Technical Service Specialist ("TSS") from Fall 2004 through Spring 2007, covering the St. Louis and mid-Missouri area. As a TSS for SJM, Relator was responsible for assisting with the marketing, sale and distribution of cardiovascular medical devices which included managing the completion of any required paperwork and patient enrollment documents related to post-market studies being conducted by SJM. His territory was part of SJM's West Central West ("WCW") area comprised of North Dakota, South Dakota, Minnesota, Illinois, Missouri, Iowa, Wisconsin and Nebraska.

8.    Relator brings this action based on his direct, personal, independent, and unique knowledge obtained during the period of his employment with DEFENDANT, and also on information and belief. As characterized by the Federal False Claims Act, Plaintiff may be referred to as "Relator" hereafter. Most if not all of the actionable allegations set forth in this Complaint are not based on a public disclosure as set forth in 31 U.S.C. § 3730(e)(4). Notwithstanding same, Relator is an "original source" of the facts alleged in this Amended Complaint and in prior Complaints and has voluntarily provided this information to the United States prior to filing of this action and the original Complaint.

9.    SJM, together with its subsidiaries, engages in the development, manufacture and distribution of cardiovascular medical devices and implantable neuromodulation devices for the

3

global cardiac rhythm management, cardiac surgery, cardiology, and atrial fibrillation therapy areas. SJM markets and sells its products through a direct sales force and independent distributors in the United States and other countries. SJM's headquarters are located in St. Paul, Minnesota.

10.     At all times relevant hereto, SJM acted through its agents and employees, and the acts of said DEFENDANT'S agents and employees were within the scope of their agency and employment. The policies and practices alleged in this Complaint were, on information and belief, set or ratified at the highest corporate levels of SJM.

## THE MEDICAL DEVICES AT ISSUE MANUFACTURED BY DEFENDANT SJM

11.     This Complaint involves two types of medical devices, pacemakers and implantable cardioverter defibrillators (ICDs), both of which have been the subject of multiple SJM post-market clinical trial studies.  Post-market studies are studies that ostensibly assess the clinical performance of a medical device or drug after that device or drug has been approved by the United States Food and Drug Administration ("FDA").

12.     Pacemakers are battery-powered implantable devices that function to electrically stimulate the heart to contract and thus to pump blood throughout the body.  Pacemakers consist of a pager-sized housing device which contains a battery and the electronic circuitry that runs the pacemaker, and one or two long thin wires that travel through a vein in the chest to the heart. Pacemakers are usually implanted in patients in whom the heart's own "spark plug" or electrical system is no longer functioning normally.

13.     An implantable cardioverter defibrillator (ICD) is a small implantable device that looks similar to a pacemaker. While pacemakers can speed up a slow heart rate, ICDs were designed to slow down a fast heart rate. In addition, many ICDs also contain a built-in full-featured

4

pacemaker. The ICD detects arrhythmias (both Brady arrhythmia and tachyarrhythmia) and delivers electrical therapy-pacing pulses or defibrillation therapy as necessary. When not needed, the ICD merely monitors the heart without delivering any electrical energy.

14.     Medical device companies such as SJM sell products directly to healthcare providers (e.g., hospitals and skilled nursing facilities). Government Healthcare Programs end up paying for these devices either under a bundled rate (which not only includes the cost of the devices, but also includes the cost of the implant procedures), or unbundled (paying for the devices themselves), depending upon the particular Government Healthcare Program's reimbursement plan. After implantation, there are follow up visits.

## GOVERNMENT HEALTHCARE PROGRAMS

15.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services. The program is overseen by the United States Department of Health and Human Services through the Centers for Medicare and Medicaid Services ("CMS"). Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services and durable medical equipment to persons over sixty-five (65) years of age and others that qualify under the terms and conditions of the Medicare Program based on disability or affliction with certain diseases. See 42 U.S.C. §§ 1395 to 1395ccc. For purposes of this case, there are two general components to the Medicare program, Part A and Part B. A physician or provider is paid for device implantation under Part A, while device follow up and interrogation is reimbursed through Medicare Part B. SJM provides the programmer and technical support, and gives the doctor money if patient was in a registry or study.

16.     Part A of the Medicare Program, set forth in Title XVIII of the Social Security Act,

5

authorizes payment for institutional care, including inpatient hospital care and related services. *See* 42 U.S.C. §§ 1395c-1395i-5. To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries", typically insurance companies, who are responsible for processing and paying claims and auditing cost reports. *See* 42 U.S.C. § 1395h. In the case of Part B, CMS contracts with "carriers" who have the same or similar functions as the fiscal intermediaries on the Part A side. *See* 42 U.S.C. § 1395u

17.     HHS issues a Hospital Manual, which is distributed to all Medicare providers, to inform them of its reimbursement policies and procedures. Similar manuals are provided to the fiscal intermediaries (the "Intermediary Manual") and to the carriers. These manuals are an essential source of information to Medicare providers and intermediaries regarding Medicare coverage policies for Part A and Part B, respectively.

18.     Upon discharge of a Medicare beneficiary from the hospital, the hospital submits an interim reimbursement claim for items and services provided to that patient. These claims are submitted on a standard form (HCFA-1450)(UB-92). For Part B services, the health care provider submits a claim for reimbursement using a Form CMS-1500.

19.     CMS issued a Medicare National Coverage determination in 1986 providing limited coverage of implantable defibrillators (ICDs). The policy has expanded over the years with revisions in 1991, 1999, and 2003, and ultimately a Medicare National Coverage decision memo for implantable defibrillators (CAG-00157R3) dated January 27, 2005 which considerably expanded Medicare coverage for ICDs. The benefit category for ICDs is the prosthetic devices category.

20.     The Medicaid program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. §§ 1396, *et seq.*, is a system of medical assistance for indigent individuals. Though

6

federally created, the Medicaid program is a joint federal-state program in which the United States provides a significant share of the funding for the program. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50 percent and is as high as 83 percent. The Medicaid Program is overseen by the United States Department of Health and Human Services through CMS. The States directly pay providers, with the States obtaining the federal share of the payment from accounts which draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30 (1994). Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needy individuals that qualify for Medicaid.

21.     By enrolling in a state's Medicaid program, all health care providers agree to abide by the state's Medicaid manual. The Medicaid manuals for individual states typically incorporate the anti-fraud provisions of the Medicare Program (see discussion infra).

22.     Among the rules and regulations which enrolled providers in both the Medicare and Medicaid program agree to follow are to: (a) bill for only those covered services which are medically necessary; (b) neither bill for any services which were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information relating to provider costs or services; (c) not engage in any act or omission that constitutes or results in over utilization of services; (d) be fully licensed and/or certified under all applicable state and federal laws to perform the services provided; (e) comply with the applicable state and federal statutes, policies and regulations; and (f) not engage in any illegal activities related to the furnishing of services or products.

7

23.     Provider hospitals participating in the Medicaid program are required to file annual cost reports with the state agencies administering that particular state's Medicaid program and are required to submit claim forms identical to those used in the Medicare program.

24.     TRICARE Management Activity, formerly known as CHAMPUS, is a program of the Department of Defense that helps pay for covered civilian health care obtained by military beneficiaries, including retirees, their dependents, and dependents of active-duty personnel. *See* 10 U.S.C. §§ 1079, 1086; 32 C.F.R. Part 199. TRICARE contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted by DEFENDANT under the TRICARE program. The federal government, through its Departments of Defense and Veterans Affairs, also maintains and operates medical facilities including hospitals.

25.     The Federal Employees Health Benefits Program ("FEHBP") provides health care benefits for qualified federal employees and their dependents.  (Together these programs described in the preceding paragraphs shall be referred to as "Federal Health Care Programs" or "Government Health Care Programs").

26.     Reimbursement practices under all Government Health Care Programs closely align with the rules and regulations governing Medicare reimbursement. The most basic requirement for reimbursement eligibility under Medicare, Medicaid and other Government Health Care Programs is that the service provided must be reasonable and medically necessary. See, e.g., 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50.  Medical providers are not permitted to bill the government for medically unnecessary services or procedures performed solely for the profit of the provider.  See id.

8

27.    As described further below, each of the Government Health Care Programs

requires every provider who seeks payment from the program to promise and ensure compliance

with the provisions of the federal Anti-Kickback Statute (discussed infra) and with other federal

laws governing the provision of health care services in the United States.    For example,

physicians and hospitals enter into Provider Agreements with CMS in order to establish their

eligibility to seek reimbursement from the Medicare Program.    As part of that agreement, without

which the hospitals and physicians may not seek reimbursement from Federal Health Care

Programs, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that
> apply to [me]. The Medicare laws, regulations, and program instructions are
> available through the [Medicare] contractor. I understand that payment of a claim
> by Medicare is conditioned upon the claim and the underlying transaction
> complying with such laws, regulations, and program instructions (including, but
> not limited to, the Federal anti-kickback statute and the Stark law), and on the
> [provider's] compliance with all applicable conditions of participation in
> Medicare.

Form CMS-855A; Form CMS-8551 (effective 2001). In addition, the claims themselves

as submitted contain a similar certification. See, e.g., Form CMS-1500.

28.    When a provider submits a claim for payment, he or she does so subject to and

under the terms of its certification to the United States that the services for which payment is

sought were delivered in accordance with federal law, to include without limitation the Anti-

Kickback Statue. In the case of Medicaid, each State's Medicaid Program's applicable

certifications also incorporate relevant state law.

29.    DEFENDANT SJM sells the medical devices at issue in this case to hospitals and

other institutional healthcare providers (hereafter "Health Care Professionals" or "HCPs"). These

9

same HCPs received millions of dollars in Medicare, Medicaid, TRICARE and other Government

Healthcare Program reimbursements and monies for these devices. In turn, the physicians and other

HCP's who purchased and prescribed such devices while participating in the phony trials and

registries described herein and receiving the unlawful inducements described herein, have received

millions of dollars for their services, in addition to the phony trial/registry payments, and unlawful

inducements.

30.     Services for these patients at issue in this case would be billed under the

numerous CPT codes that apply to the implantation of a device in a hospital setting. Attached

hereto as Exhibit 1 is a true copy of a SJM explanation of the applicable CPT codes. For follow

up visits in the office setting the CPT codes are: 93741-94744 (for ICD follow up); and 93731-

93735 (for Pacemaker follow up).

## LEGAL BACKGROUND

31.     The Federal FCA provides, in pertinent part that any person who :

> (a) (1) knowingly presents, or causes to be presented, to an officer
> or employee of the United States Government or a member of the
> Armed Forces of the United States a false or fraudulent claim for
> payment or approval; ...or

> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a
> false record or statement material to a false or fraudulent claim; ...

> is liable to the United States Government for a civil penalty of not
> less than $5,000 and not more than $10,000, ... plus 3 times the
> amount of damages which the Government sustains because of the
> act of that person.

31 U.S.C. § 3729. On May 20, 2009, the False Claims Act was amended pursuant to Public Law

111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"). Section 3729(a)(1)(B) was

formerly § 3729(a)(2), and is applicable to this case by virtue of § 4(f) of FERA, while § 3279(a)(1)

of the statute prior to FERA, and as amended in 1986, remains applicable here.

32.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended

by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099,

47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations

occurring on or after September 29, 1999.

> For purposes of the FCA,
>
> The terms "knowing" and "knowingly" mean that a person, with respect to information (1)
> has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or
> falsity of the information; or (3) acts n reckless disregard of the truth or falsity of the
> information,
>
> and no proof of specific intent to defraud is required..

31 U.S.C. § 3729(b).

33.     The Federal FCA defines a "claim" to include any request or demand, whether under

contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient

if the United States Government provides any portion of the money or property which is requested or

demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any

portion of the money or property which is requested.  31 U.S.C. § 3729(b)(2).

34.     In addition, the Federal FCA, 31 U.S.C. § 3730(h), provides relief to employees

who have been retaliated against in their employment because of lawful acts done by the

employee in furtherance of efforts to stop one or more violations of the FCA.  Such retaliation

may include discharge, demotion, suspension, threats, harassment or any other type of

discrimination in the terms and conditions of employment.  The employee is entitled to all relief

necessary to make that employee whole, including reinstatement, two times back pay, interest on

the back pay, and compensation for any special damages, including litigation costs and

reasonable attorney's fees.

35.     The Medicare and Medicaid Patient Protection Act, also known as the federal Anti-

Kickback Act, 42 U.S.C. § 1320a-7b(b) ("AKA"),  prohibits any

person or entity from making or accepting payment to induce or reward any person for referring,

recommending or arranging for federally-funded medical items or services, including items or

services provided under the Medicare, Medicaid, and TRICARE programs. In pertinent part, the

AKA states:

> Whoever knowingly and willfully offers or pays [or solicits or
> receives] any remuneration (including any kickback, bribe, or rebate)
> directly or indirectly, overtly or covertly, in cash or in kind to any
> person to induce such person to refer an individual to a person for the
> furnishing or arranging for the furnishing of any item or service for
> which payment may be made in whole or in part under a Federal
> health care program, or to purchase, lease, order or arrange for or
> recommend purchasing, leasing, or ordering any good, facility,
> service, or item for which payment may be made in whole or in part
> under a Federal health care program, shall be guilty of a felony.

42 U.S.C. § 1320a-7b(b).

36.     The AKA seeks to prohibit such activities in order to secure proper medical treatment

and referrals, and to limit the possibility of a patient having to undergo unnecessary treatments or

having to accept specific items or services which are based not on the needs of the patient, but on the

incentives given to others, thereby limiting the patient's right to choose proper medical care and

services.

37.     The AKA  arose out of congressional concern that the remuneration and gifts

12

given to those who can influence health care decisions corrupts medical decision-making and could result in the provision of goods and services that are more expensive and/or medically unnecessary or even harmful to a vulnerable patient population. To protect the integrity of the federal health care programs, Congress enacted a prohibition against the payment of kickbacks in any form. The AKA was enacted in 1972 "to provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful . . . and which contribute appreciably to the cost of the Medicare and Medicaid programs." H.R. Rep. No. 92-231, 92d Cong., 1st Sess. 108 (1971), reprinted in 1972 U.S.C.C.A.N. 4989, 5093.

38.     The AKA was strengthened by amendments in 1977 and 1987 which, *inter alia*, increased the criminal penalties from a misdemeanor to a felony and subjected the perpetrator to exclusion from participation in federal health care programs (42 U.S.C. § 1320a-7(b)(7)), civil monetary penalties of $50,000 per violation (42  U.S.C. § 1320a-7a(a)(7)), and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose.  42 U.S.C. § 1320a-7a(a).

39.     Concern about improper marketing practices prompted the Inspector General of the Department of Health and Human Services to issue  a  series of Special Fraud Alerts in 1994 concerning various practices that could run afoul of the AKA.  *See* Special Fraud Alert: Prescription Drug Marketing Schemes, 59 Fed. Reg. 65,376 (Dec. 29, 1994); see also Fed. Reg. Dec. 19, 2004.  In one Fraud Alert issued in October 1994 (and contained in the above), the OIG stated, *inter alia*,

Generally, a payment or gift may be considered improper …if it is:

• Made to a person in a position to generate business for the paying party;

13

- Related to the volume of business generated; and
- More than nominal in value and/or exceeds fair market value of any legitimate service rendered to the payer, or is unrelated to any service at all other than referral of patients.

OIG scrutiny may be warranted for example for:

Grants to physicians and clinicians for studies of prescription products when the studies are of questionable scientific value and require little or no actual scientific pursuit. The grants may nonetheless offer substantial benefits based on, or related to, use of the product.

40.     In May 2003, the Inspector General of HHS published further guidance on

marketing practices which may constitute kickbacks known as the "OIG Compliance Program

Guidance for Pharmaceutical Manufacturers," 68 Fed. Reg. 23731 (May 5, 2003) (the "OIG

Guidelines"). In those Guidelines, the OIG further addressed "Research Funding" as follows:

Manufacturers often contract with purchasers of their products to conduct research activities on behalf of the manufacturer on a fee-for-service basis. These contracts should be structured to fit in the personal services safe harbor whenever possible. Payments for research services should be fair market value for legitimate, reasonable, and necessary services. *Post marketing research activities should be especially scrutinized to ensure that they are legitimate and not simply a pretext to general prescriptions of a drug. Prudent manufacturers will develop contracting procedures that clearly separate the awarding of research contracts from marketing. Research contracts that originate through the sales or marketing functions-or that are offered to purchasers in connection with sales contracts—are particularly suspect.*

Id. at 23735-36 (emphasis added).

41.     As described above, compliance with the AKA is a precondition to participation

as a health care provider under a Government Health Care Program, including Medicare and the

state Medicaid programs. Moreover, compliance with the AKA is a *condition of payment.* As

noted above, reimbursement practices under all Government Health Care Programs closely align

with the rules and regulations governing Medicare reimbursement, and each of the Government

14

Health Care Programs requires every provider who seeks payment from the program to promise and ensure compliance with the provisions of the AKA and with other federal laws governing the provision of health care services in the United States. In other words, if a provider tells CMS or its agent that it provided services in violation of the AKA (or another relevant law), CMS will not pay the claim. Provider agreements as well as the claims themselves contain a certification of compliance with all Medicare laws, regulations, and program instructions including the AKA. *Se, e.g.,* Form CMS-855A; Form CMS-8551 (effective 2001); Form CMS-1500.

42.     When a provider submits a claim for payment, he or she does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, to include without limitation the AKA. In the case of Medicaid, each State's Medicaid Program's applicable certifications also incorporate relevant state law.

## DEFENDANT SJM'S UNDERSTANDING OF THE ANTI-KICKBACK ACT

43.     DEFENDANT SJM and its employees were aware of the obligations of the AKA. They understood that it was a violation of the AKA to offer or to pay remuneration, by whatever means, to induce a customer like a hospital or doctor to purchase or to recommend the purchase of SJM's devices.

44.     For example, after the OIG Guidance was published, the Advanced Medical Technology Association ("AdvaMed") adopted in September 2003 (effective January 1, 2004), a voluntary "Code of Ethics on Interactions with Health Care Professionals" ("the Code" or "the AdvaMed Code") purportedly to guide its members on compliance with the AKA. At that time,

15

AdvaMed was the trade organization for approximately 1,100 manufacturers of medical devices, diagnostic products, and medical information systems, including DEFENDANT SJM, Medtronic, Guidant, Johnson & Johnson, and Biotronik. These members manufactured 90 percent of the $71 billion of health care technology purchased in the United States each year.

45.     The AdvaMed Code addressed, *inter alia*, member -sponsored product training and education, supporting third party educational conferences (through grants, meals, hospitality and expenses), sales and promotional meetings, arrangements with consultants including for research, gifts, providing reimbursement and other economic information, grants and other charitable donations.  The Code expressed that research and consulting services should be for *bona fide* consulting services with compensation consistent with fair market value and the payments must be to support "genuine medical research" with 'scientific merit".

46.     AdvaMed expected that: "Members will communicate the principles of this Code to their employees, agents, dealers and distributors with the expectation that they will adhere to this Code." However, AdvaMed also cautioned that : "All Members have an independent obligation to ascertain that their interactions with Health Care Professionals comply with all applicable laws and regulations.  The information provided by the  Department of Health and Human Service Office of Inspector General, as well as applicable laws or regulations, may provide more specificity than this Code, and Members should address any additional questions to their own attorneys."  AdvaMed Code pp. 5-6 (September 3, 2003).[2]

47.     DEFENDANT SJM adopted the AdvaMed Code in September 2003, effective January 1, 2004, and undertook training of its employees regarding the Code.  The Code is

---

[2]Relator has a copy of this Code and will supply it as needed as part of his Fed. R. Civ. P. 26 Initial Disclosures.

incorporated in DEFENDANT SJM's "USSD Policies, Procedures and Guidelines Manual"
effective January 1, 2004, of which Relator possesses a copy. DEFENDANT clearly recognized
that its actions were governed by the AKA. For example, that Manual states:

> St. Jude Medical has adopted the AdvaMed Code of Ethics on Interactions with Health
> Care Professionals (the AdvaMed Code). In addition to the AdvaMed Code, the St. Jude
> Medical Code of Business Conduct dealing explicitly with "Relationships with Physician
> and Customers" and the Medicare Anti-kickback Law also govern this area.

48.     Relator was trained after he was hired by DEFENDANT in November 2004.

These trainings consisted of: (1) his reading the employee handbook (including the AdvaMed
guidelines), signing, and mailing back the completed signature page to General Counsel, St. Jude
Medical, One Lillehei Plaza, St. Paul, MN, USA 55117; (2) his responding to an email in
November 2005 which required Relator to reread the compliance material and confirm he had;
and (3) his viewing a "Legal Minefield" webcast, also in November 2005.

49.     As this Complaint alleges, notwithstanding SJM's understanding of the AKA, and
Relator's alerting company officials to the ongoing misconduct on several occasions in 2005-
2007, SJM repeatedly violated the AKA in its relationships with Health Care Professionals by
paying them sham fees for phony post-market clinical research studies, and by paying for or
providing them (and in some cases their spouses) entertainment, gifts, travel, vacations,
temporary staff, tickets to sporting events, "educational" events at luxury resorts, and other
illegal inducements. These payments had the intended effect of causing HCPs to order or
prescribe SJM products and devices instead of a competitor's.

## DEFENDANT SJM's KICKBACKS TO HEALTH CARE PROFESSIONALS

50.     Relator worked as a TSS in the Cardiac Rhythm Management Division

17

("CRMD") of SJM.  The CRMD was part of the United States Sales Division, which division offers cardiac resynchronization therapy devices, implantable cardio-defibrillators, pacemaker leads, introducer systems, and device programs used to treat certain cardiac arrhythmias.  There are over 1,000 sales representatives and about 300-500 TSS's in the CRMD division.  The CRMD is one of 5 product category corporate divisions.  Relator was part of West Central West ("WCW") , which comprises the states North Dakota, South Dakota, Minnesota, Illinois, Missouri, Iowa, Wisconsin, and Nebraska.  WCW is broken down into 6 regions, "WCW1 through WCW5 and WCW-AF," of which Relator was in WCW2, the St. Louis and mid-Missouri areas.  The Senior Regional Director of these 6 regions was Doug Helm; below him were about 8-10 sales representatives; below them are approximately 14 TSS's, one of whom was Relator.

51.     The DEFENDANT'S entire United States' sales force (consisting of between 1,300-1,500 people) was given unlimited budgets for marketing while Relator worked there. For example, Relator knows of one person in his area who had a weekly expense account of about $5,000 (i.e. over $250,000/year). This allowed the sales force to provide various types of incentives to physicians to order pacemakers and ICDs and to enroll patients in and participate in studies/registries, and to reward physicians for doing so, no questions asked.  In addition, the Relator is aware of many examples of lavish entertainment, including but are not limited to, payment of airline tickets, conference fees, baseball tickets, gourmet wine, lavish meals, trips, and vacations.

### Phony Post-Market Registries, Studies and Trials As Kickbacks

52.     The Scientific Studies Organization (SSO) is a department of SJM. It is located at
15900 Valley View Court, Sylmar, CA 91342. SSO on the surface conducted the post-market
clinical studies described below. Each territory is assigned a "Field Clinical Engineer" (FCE) from
SSO, to maintain contact with the physicians concerning the studies/clinical trials. In practice, the
SJM sales force maintained the contact with the physicians too - in fact, the sales force often filled
out the phony trial paperwork, with the physician having no involvement in data input, all as more
fully described below.

53.     The FCE's were integrally involved with sales, not science. The FCE's actively
supported and worked with the sales force to have as many targeted physicians as possible involved
in clinical trials/studies. A May 8, 2004 email to the Relator (and others) from management, is
illustrative:

> FCE Utilization
>
> We demonstrated an excellent working relationship with the FCE
> Team throughout the RHYTHM ICD clinical trial. This is
> substantiated by the North Midwest Area's top position nationally in
> total implants for the study. I feel that the communication level
> between the CRM Team and FCE Team... and our ability to function
> as an integrated Team... are at the highest levels.

54.     The clinical trials described herein were clearly designed and implemented for the
purpose of paying physicians to prescribe DEFENDANT'S products, not for *bona fide* scientific
research. The sales force handling the sham studies earned more money the more clinical trial
patients were enrolled. This is confirmed in writing, for instance, in a May 8, 2004 management e-
mail to the Relator:

> [C]linical trial devices will count toward the tier level. Pricing of

19

clinical trial devices will be priced separately outside of this agreement.

55.     Although the sales force earned commissions, sales of devices that were associated with a phony trial meant that the sales representative would have his commission reduced by approximately 20% of the cost of the study, to offset the payments made by DEFENDANT to physicians. For example, if a payment was made to a physician in the amount of $1,500, then the sales representative was responsible for $300 of the cost of the study, through commission reduction.

56.     Not only would physicians prescribe the SJM devices for patients who did not previously have a pacemaker, they also prescribed the SJM devices as replacements for the competitor (e.g., Guidant, Medtronic) pacemakers. Once the patient's device reached its "elective replacement indicator", the switch was made to the SJM product. This was done by doctors in order to receive study money.

57.     Certain cardiologists selected SJM devices based upon the existence of a trial/study, so that if they could use a device which was the subject of a trial/study/registry, they would receive additional payment from DEFENDANT, in addition to professional fees. Examples of such doctors are Drs. AH, MK, and TMcD.

58.     Certain cardiologists also billed Medicare and other insurers for the SJM study visits even though they did not perform any work required by the study protocol as described below. Examples of such doctors are Drs. MK and TMcD. These same doctors instructed SJM employees in preparing "superbills" so the doctors could submit claims to Medicare/Medicaid, and SJM employees would prepare such superbills despite the SJM Code of Conduct seemingly prohibiting them from assisting with reimbursement or billing paperwork.

20

59.      Certain cardiologists also failed to fill out the proper paperwork and/or to perform the required services despite what they agreed to as part of the research study agreement, the investigator's agreement, or the protocol. Instead, certain members of the SJM sales force did this for the doctors despite the fact that doing so puts the integrity of the study data at risk. Examples of such doctors are Drs. AH, MK, and TMcD.

60.      Relator's supervisor, Doug Helm, was the Senior Regional Director for WCW; with responsibility over Missouri, Illinois, Kansas and Nebraska, permitted or even required the sales force under his supervision to engage in this misconduct. The conduct Relator was personally aware of in his area, was also ongoing in the rest of Mr. Helm's region. As described below, SJM management was aware of the misconduct, but did not take adequate steps to stop, correct, or prevent the misconduct.

61.      Unlike the phony trials described herein, SJM has legitimate clinical trials; in fact, the Relator had direct involvement with the "Optimal Lead Place" and ASPEN Studies.

## AWARE Trial-(Analysis Of A New AT/AF Detection Algorithm In Patients With Atrial Arrhythmias)

62.      AWARE stands for "Analysis of a New AT/AF Detection Algorithm in Patients with Atrial Arrhythmias." The AWARE Trial involved 2 pacemaker models: (1) Identity ADx DR 5380, advertised as the world's smallest dual-chamber, rate-responsive pacemaker;" and (2) Identity ADx XL DR 5386, advertised as "dual-chamber, rate responsive, extended longevity pacemaker." A true copy of the AWARE Trial "Scientific Study Plan" is attached as Exhibit 2. Among other things, it notes that the patient's "insurance company will be billed for all procedures or tests that are standard medical treatment for your condition."

21

63.     For the AWARE Trial, physicians receive $700 for the initial implant of the pacemaker, and $100 for each follow-up visit for the pacemaker, usually done at 1, 3, and 6 months. The trial is a sham, designed to induce physicians to prescribe the above pacemakers and millions of dollars were paid to physicians across the country.

64.     The inclusion criteria (see § 3.3.1 of the Study Plan) are not adhered to. About 30% of the patients had no history of Atrial Tachy cardia (AT) or Atrial Fibrillation (AF), inclusion criteria. Instead, they had a diagnosis of AV nodal block (Heart block 1st, 2nd, and 3rd degree) and were enrolled in the studies on that basis alone.

65.     Similarly, the exclusion criteria (see § 3.3.2 of the Study Plan) are not adhered to. Patients having terminal cancer and who were expected to live only a few months at best were implanted with pacemakers and put into the trial.

66.     At no time did the Relator receive notice from SSO that any patient did not qualify and/or was rejected from the AWARE trial. There is no integrity of the study because it is the sales representative making the call as to whether the patient qualified for the trial.

67.     The AWARE trial expressly contemplates physicians' diagnosis and treatment for the "study" subjects. For instance, at § 3.1 of the Study Plan, it states that "The *physician* will provide a clinical diagnosis for all documented episodes on the case report form at *each* visit based on any of the following sources: stored electrograms, surface E.C.G.'s, and/or device diagnostics." (emphasis added). Physicians, however, had little to no involvement or participation in the "study."

68.     The articulated "purpose of study" set forth in § 1.2 of the Study Plan, "is to evaluate the incidence of AT/AF and inappropriate detection of AT/AF events in patients with a history of AT

22

or AF. The AT/AF detection algorithm data and AT/AF detection triggered stored EGMs will be compared with the *physician's* clinical diagnoses." (emphasis added). Yet, the paperwork for the trial was filled out by the SJM sales force. If not accessible to the sales force, which was often the case, data was made up. For instance, at implant, one question concerns what medications the patient is taking. To answer, the sales force would look at the patient surgical chart from implantation and copy the medications written in the chart. For the 1, 3, and 6 month follow-up, they would copy what was written on the enrollment form because they did not have access to the charts in the doctors' offices. There are instances where the medications had changed, but were improperly noted on the paperwork.

69.     The sales force would also sign the doctor's signature on the forms or obtain the doctor's signature on a blank form. After the data was filled in by the sales force, a copy of the study paperwork was to be shipped via FedEx to SSO in Sylmar, California, with a copy also kept on file in the physician's office. Relator is aware of at least one instance where the study paperwork was still not returned to the SSO some 6 months after the patient's visit.

70.     AWARE enrollments stopped in December 2005. The Relator was told that the quota was met. Although SJM's internal records in 2006 showed a Registry with a number of 1,200 patients in the AWARE Trial (due to a cap), Relator at one point observed records indicating 1,500 or more in the trial. SJM funded this kickback program with at least 1.5 million dollars in payments to physicians.

71.     Relator is aware of numerous patients affected by the above-described misconduct who were treated by Drs. MK, AH and TMcD. These doctors were never present for the 1, 3, or 6

23

month follow-up visit; instead Relator was expected to meet with the patients and fill out the paperwork. Examples of these patients (with names redacted for privacy) are attached hereto in Exhibit 3. All or virtually all of these patients were covered by Medicare by virtue of their age, or by another Government Healthcare Program. Doctors also instructed SJM sales force to fill our "superbills" for their patients' study visits in order to obtain reimbursement from Government Healthcare Programs. For example, Drs. MK and TMcD instructed Relator to do so and he did.

## ACT Registry (ADVANCEMENT IN ICD THERAPY)

72. The ACT Registry is a data collection "registry," not a clinical trial. A true copy of the ACT "Registry Plan" is attached hereto as Exhibit 4. According to the "Registry Plan," "[a]ny patient that receives an FDA-approved SJM ICD or CRT-D is eligible for enrollment into the registry." Patients were supposed to be followed for a period of 24 months after implant, with data collected at enrollment, and also at 6, 12, 18, 24 months and at any unscheduled follow-up visits. During the follow-up visits, arrhythmic episode diagnoses, device data and stored electrograms are collected. § 3.2 of the Registry Plan provides that 5,000 patients would be enrolled.

73. Physicians received a total of $2,000 ($500 each for enrollment and $375 each for the follow-up visits, scheduled at 6, 12, 18, and 24 months), and millions of dollars were paid to physicians across the country. Although the stated purpose for the physician payments are "for the legitimate reimbursement of time, effort, and oversight by the Investigator and the professional staff", it was the SJM employee who performed these tasks. For example:

On or about September 16, 2006, an FCE from SSO was in the office of Dr. MK with Relator. The FCE had Dr. MK sign blank case report forms that were later filled out by the Relator and the FCE from patient charts.

On or about September 19, 2005, a SJM TSS filled out a study form for a patient identified

24

as "COLLAW" (to protect patient privacy, the study forms identified patients by a "name" that was comprised of the first 3 letter of the patient's last name and the first 3 letters of the patient's first name), an 81 year old male implanted with an ICD on or about March 2, 2005. The TSS also rubber stamped the signature of Dr. MK. On the form, the "Current Drug Therapy" section was not filled in and section number 5, "Clinical Diagnoses" was not answered. Dr. MK was paid $500 by SJM for the submission of this form in addition to what she was reimbursed by Medicare.

On or about March 21, 2006, the follow up form was filled out by an FCE from SSO and also rubber stamped with Dr. MK's signature. Dr. MK was paid $375 by SJM for this follow up visit in addition to what she was reimbursed by Medicare.

Another follow up data form for patient COLLAW was filled out by the FCE from SSO on or about October 17, 2006. The FCE had Dr. MK sign a blank form before the patient came in. The form as filled out later by the FCE listed the patient on two drugs, Lasix and Coreg, and then in the number 3 section "Drug Therapy adjusted" box was marked "no". However, it should have been marked "yes' because the prior visit forms listed no drugs for this patient. Again, Dr. MK was paid $375 by SJM for this follow up visit in addition to what she was reimbursed by Medicare.

Similar misconduct occurred with respect to a patient known as "LUTWIL", a 78 year old male who had an ICD implanted on or about March 23, 2005. The enrollment form was incomplete and inaccurate and the signature may not be that of Dr. MK. Dr. MK was paid $500 by SJM for the enrollment of this patient and also billed Medicare.

At the follow up on or about October 17, 2005, an SJM TSS filled in the data which inaccurately stated that there was no drug adjustment, and rubber stamped the doctor's signature. Dr. MK was paid $375 by SJM for this follow up visit in addition to what she was reimbursed by Medicare.

Patient LUTWIL's follow up on or about April 18, 2006 was done by an SJM FCE from SSO, but again, Dr. MK was paid and billed Medicare.

The patient's follow up on or about October 17, 2006 was also done by the FCE. Dr. MK signed a blank follow up data form prior to the patient visiting. The FCE incorrectly marked the number 6 box (which asked for any changes at the previous follow up visit) "no" even though the prior visit forms showed on line number 6 that the device had been reprogrammed and changes *were* made to the tachycardia parameters. Dr. MK was paid $375 by SJM for this follow up visit and billed Medicare for the ICD follow up.

74.     In or about January 2006, CMS established a mandatory ICD registry. *See* "Report of

25

a New System of Records", 70 FR 72437 (Dec. 5, 2005). The data to be reported is substantially identical to the ACT Registry, which started in January 2004.

75.     SJM funded this kickback program with at least $10 million in payments to physicians.

76.     Relator is aware of numerous patients affected by the above-described misconduct. In addition, some of the patients were enrolled even though they were outside the specified 45 day window (past the implant date) as required by the protocol. A true copy of a list of ACT Registry patients in WCW2 when Relator was employed at SJM is attached hereto as Exhibit 5 (with patient full names omitted by SJM for privacy reasons). Many of these patients were treated by Drs. MK, AH, and TMcD. All or virtually all of these patients listed on Exhibit 5 were covered by Medicare by virtue of their age, or by another Government Healthcare Program. Doctors also instructed SJM sales force to fill our "superbills" for their patients' study visits in order to obtain reimbursement from Government Healthcare Programs. For example, Drs. MK and TMcD instructed the sales force to do so, and they did; on or about September 19, 2006, Dr. MK instructed Relator on filling out her superbill prior to her billing Medicare/Medicaid. All claims specifically identified for said specifically identified patients from the specifically identified implant date through at least the term of the study are false claims caused by the Defendant.

## PROVE Trial - Programming Ventricular Tachycardia Therapy in Patients with a Primary Prevention Implantable Cardioverter-Defibrillator Indication.

77.     Patients are eligible for the study once they become scheduled to have an ICD implanted.

78.     According to the Study Plan, the articulated purpose of the study "is to determine if

turning ATP therapy "ON" (as part of the VT Therapy) can successfully stop VT episodes before they become VF, which is more serious."(p.2) Relator possesses a true copy of the PROVE Study Information and Consent Form; among other things, it notes that the patient's insurance company will be billed for all procedures or tests that are standard medical treatment, including the costs of the ICD device and implantation procedure, and the follow-up doctor visits.

79.     The study is supposed to last for one year after enrollment, with follow-up appointments at 3, 6 and 12 months. Although physicians typically have no involvement with the study, they are paid hundreds of dollars for each patient. Oftentimes, there was no scientific value to the "study" results, among other reasons, because of improper programming at enrollment, and no-shows by patients.

80.     The "Research Subject Information and Consent Form" provided to patients misleadingly states: "You do not have to participate in this study to receive treatment for your condition. You can have the standard ICD implantation and programming done without being in the study." (p.3)

81.     SJM funded this kickback program with at least $10 million in payments to physicians.

82.     Relator is aware of numerous patients affected by the above-described types of misconduct. For example, he is aware of patients "REYLAR" and "MEROLI" who were treated by Dr. MK. Again, Dr. MK signed blank forms (e.g., on or about September 19, 2006) and a TSS and/or an FCE filled in the data on the form. On one occasion, Relator was shown a stack of patient charts by an FCE and told that she (the FCE) had to go through them later. Again, Dr. MK was paid

27

by SJM.

83.    Virtually all of the patients enrolled in PROVE were covered by Medicare by virtue of their age, or by another Government Healthcare Program.  Doctors also instructed SJM sales force to fill our "superbills" for their patients' study visits in order to obtain reimbursement from Government Healthcare Programs.  For example, Drs. MK and TMcD instructed the sales force to do so, and they did, including on or about September 19, 2006, when Dr. MK instructed Relator on doing so

### RARE Trial

84.    The RARE trial evaluated the incidence of AF in patients with SSS (Sinus Node Dysfunction) by comparing the Auto Mode Switch (AMS) with the AMS triggered electrograms (EGMs).

85.    One of the lead investigators was Dr. AH.  The study was ongoing when Relator began working at SJM.  The study ended in early 2005. DEFENDANT'S SSO published posters in May 2005. They are: Poster - AB -15-2 and Poster AB9-1.  Relator possesses true copies of these Posters. These Posters falsely listed Dr. AH as the author when in fact they were written by SJM and they paid for Dr. AH to go to the annual meeting of the prestigious Hearth Rhythm Society ("HRS") to present the posters.  Upon information and belief, nothing further was done with the data.

86.    Upon information and belief, physicians including Dr. AH received $1500 per patient enrolled in the study, and millions of dollars were paid in total to physicians across the country. Exhibit 3, *supra* at p. 1 contains examples of patients who were enrolled in the RARE study.  On information and belief, in addition to the kickbacks, the other misconduct that afflicted the AWARE

study and the ACT Registry also afflicted the RARE Trial.

### RATE Registry (Prevalence of AT/AF in the CRM Device Population)

87.     The purpose of the Rate Registry according to the Registry Plan, "is to produce a prospective, outcome-oriented registry to document the prevalence of atrial fibrillation (AF) in the [Cardiac Rhythm Management] CRM population by using the Advanced AT/AF Diagnostics in select SJM devices." Relator possesses a true copy of the RATE "Scientific Registry Plan" and other forms.

88.     The study started around October 2006 and it was a prospective, two year data collection registry.

89.     Eligible patients are those "that receive a St. Jude Medical (SJM) CRM device with advanced AT/AF diagnostic capabilities (Victory®, Epic®, Atlas® II, or comparable future devices.)"

90.     The less expensive SJM devices that also have the advanced AT/AF diagnostic capabilities are not eligible for the study. Further, there is no difference in diagnostics: the Rate Registry ICD devices vibrate and beep, while the less expensive models that do not qualify for the study, only vibrate if an alert indication is met. For example, alert indications include high impedance of the right ventricle lead, or battery voltage at "end of life."

91.     Data is supposed to be collected at implant and quarterly, for a total follow-up duration of 24 months.

92.     Reimbursement to physicians is $1600 per patient: $400 for enrollment, $200 each for 6, 12, 18, and 24 month follow-up visits, and $100 each for 3, 9, 15 and 21 month follow-up visits,

and millions of dollars were paid to physicians throughout the country. One of the doctors involved in the study was Dr. MK. As with other studies described above, the SJM sales force had doctors such as Dr. MK sign blank patient study related forms.

93.    In addition, through this registry, SJM encouraged or required doctors to use a more expensive SJM device (such as Victory, Epic Il, Atlas II, or comparable devices coming out in the future) and did not inform doctors of the option of using a less expensive device with the same advanced diagnostic capabilities (e.g., Integrity, Epic, Atlas). As with other studies, SJM personnel had doctors sign blank study forms. For example, on or about October 17, 2006, Dr. MK signed blank forms.

## Other Trials As Kickbacks

94.    Other phony trials conducted by SSO with the same monetary inducements include but are not limited to: Determine, WBC-MRI, RethinQ, Pas, Freedom, and Response H.F. In December 2007, the Relator became aware that the top 15 enrolling sites across the United States for the Freedom Trial had a total of 159 patients. The top 15 enrollment sites included Long Island Heart Associates in New York, New York; Cardiology and Arrhythmia Consultants in Rochester Hills, Michigan; Jeffrey Goodman in Los Angeles, California; Cardiovascular Associates in Birmingham, Alabama and Sentara-Norfolk General Hospital in Norfolk.

95.    For example, Dr. RW enrolled patients at the Veteran's Administration Medical Center in Columbia, Missouri.

## Entertainment (And Other Inducements) As Kickbacks

30

96.     As noted above, the DEFENDANT'S entire United States' sales force (consisting of some 1,300-1,500 people) was given unlimited budgets for marketing while Relator worked there. This allowed the sales force to provide incentives to the physicians to order pacemakers and ICDs and to enroll patients in and participate in studies/registries, and to reward physicians for doing so, no questions asked, as described above.

97.     In addition, the Relator is aware of many examples of lavish entertainment, including but are not limited to, payment of airline tickets, conference fees, baseball tickets, gourmet wine, lavish meals, payment for seating at the Lake Regional Ball, and fishing trips, including but not limited to a fishing trips to Canada.  These kickbacks had the intended effect of influencing physicians to order SJM products. For example:

a.     In Spring 2005 (March/April) SJM Senior Sales Representative Jack Conner bought airline tickets for Las Vegas for Dr. MK and his wife.  Conner also paid for the HRS Conference fees and hotel.  Relator was present when Conner gave Dr. MK an envelope in his office to pay for the trip.

b.     On May 19, 2005 SJM Senior Sales Representative Jack Conner purchased St. Louis Cardinals baseball tickets from a broker costing over $200.  These tickets were to send Dr. AH's son to the St. Louis at Kansas City baseball game.

c.     In August 2005 Dr. JH received St. Louis Cardinal baseball tickets for referring pacer/ICD cases to Dr. AH.  SJM Technical Service Representative (TSS) Mel Wyatt purchased the tickets online through the Cardinal Prime Seat Club.  Relator was present when Wyatt delivered the tickets to Dr. AH (for Dr. JH).  Relator was also present at a lunch when SJM Senior Sales Representative Conner reimbursed Wyatt for the purchase of the tickets.

d.     In August 2005 SJM Senior Sales Representative Jack Conner delivered a case of wine to the Moberly Regional Medical Center catheter lab manager, SC.  Relator was present in the lab doing an implant when Conner delivered the wine to the break room.

e.     On August 24, 2005 SJM Senior Sales Representative Jack Conner and Jason Zitzer arranged for a physician, Dr. BL from Washington University in St. Louis, to come to

the University of Missouri to present at Grand Rounds. Connor left the Grand Cru Steakhouse restaurant his credit card number to purchase dinner for three physicians (the speaker Dr. BL, Dr. RW and Dr. GF) and their wives.

f.   In September 2005 SJM Senior Sales Representative Jack Conner purchased a $2,500 fishing trip to Canada for Dr. AH and stated he had done this for the last three years. Conner also stated that he had paid $500 for a table at the Lake Regional Ball for the Lake Regional catheter lab staff.

g.   In October 2006 SJM Senior Representative Jack Conner paid $500 for a table at the Lake Regional Ball for Dr. MK's and Dr. TMcD's staff to attend.

98.   DEFENDANT also provided or facilitated other kickbacks to induce physicians, including but not limited to providing physicians and other providers with "Grants", and with temporary staff for their offices.

99.   DEFENDANT also provided payment to physicians to persuade other physicians to prescribe SJM products, including under the guise of the "HF Referral Program" and the "EP Implanter Program."

100.   DEFENDANT also provided kickbacks to physicians in Electrophysiology Fellowship Programs (EP Fellows) around the country. (EP Fellows are physicians who have already completed a Cardiology fellowship who then go on to an electrophysiology). SJM spent or was expected to spend in 2007 a total of $158,172,579 from both the CRM Division and the AF Division, for its Fellows program. SJM indicated in its internal marketing material that a single EP Fellow physician, after graduation, with a conservative utilization of SJM products, will generate $2.7 million annually. (The "Class" of 2007 EP Fellows (100 MDs) $270 million annually - $1.4 billion over five years.)

101.   Fellows Symposiums are typically held quarterly by St. Jude, at luxury resorts.

32

They provide education/marketing, plus help to place the EP Fellows. In order to place the EP

Fellows, St. Jude also conducts "core practice searches" for Fellows, helping Fellows to be

placed in medical practices. St. Jude "educational department" also furnishes a Board review for

the NASPE Exam. The Board review is done in December, prior to the Heart Rhythm Society

Meeting which is in April/June. St. Jude even has a "Fellows Manager" who the sales department

is supposed to work closely with.

102.    Previous Fellows Symposiums include one on February 2, 2007 at the Ritz

Carlton in Phoenix, Arizona and another on May 8, 2007 at the Marriott in Denver, Colorado.

Also utilized are "CAB Meetings," where St. Jude flies in Fellows for a weekend meeting.

103.    It was common practice to supply a hospital with introducers for free and allow

the hospitals to bill for them.  For example, at Moberly Regional Medical Center, Dr. AH

preferred to use TERUMO 7 FR., 10 CM LONG, PINNACLE INTRODUCER SHEATHS,.038"

GUIDE WIRE. 10/BOX and TERUMO 9 FR., 10 CM LONG, PINNACLE INTRODUCER

SHEATHS,.038" GUIDE WIRE. 10/BOX.  The cost to SJM per box was around $75.00. SJM

also provided the C Codes needed by the hospital so that they could get reimbursement from

Medicare.

104.    Also, every time a device was implanted it was common practice to buy lunch or

dinner for the staff of the catheter lab.  At Moberly Regional Medical Center, Dr. AH also

requested that his office get lunch from SJM if one of its devices was implanted at the hospital.

Also, anytime a device clinic was done at the doctor's office it was practice to provide lunch to

the office staff.

## RELATOR'S EFFORTS TO STOP DEFENDANT'S ILLEGAL ACTIVITY

105.    As a TSS for SJM, Relator was responsible for assisting with the marketing, sale and distribution of cardiovascular medical devices which included managing the completion of any required paperwork and patient enrollment documents related to the AWARE Trial and ACT Registry and other studies.

106.    As noted above, Relator received training from SJM on compliance issues. As a Registered Nurse in the State of Missouri the Relator was held to the Nurse Practice Act which the Board of Nursing can  revoke a license if the licensee is found guilty of a crime in which the essential element of fraud or dishonesty is part of the offense.

107.    In October 2005, Relator began to question SJM's practice of filling out the study paperwork and signing for doctors to his co-workers.  Unbeknownst to Relator at the time, the news media was reporting that on or about October 25, 2005, the United States Attorney's Office for the District of Massachusetts and/or DOJ, had issued subpoenas or was otherwise investigating SJM (and also Guidant,  Medtronics and other device makers) regarding various issues relating to implantable cardioverter defibrillators (ICDs) and pacemakers, including: "sales practices," illegal payments or other inducements, possible violations of the Anti-Kickback Act and false claims statutes, relationships with doctors,  use of incentives to doctors to use the device maker's products, and making excessive payments to doctors to enroll patients in post marketing evaluation studies of their devices (using product surveys) as a way of increasing sales. At least one article refers to SJM reporting that the subpoenas request documents on "cardiac devices, components, and monitoring equipment and services," as well as "general

34

industry practices."[3]

108.    When his co-workers' advice did not match with Relator's understanding from his

company training, Relator contacted Paul Bae, SJM Vice President of Human Resources and

Compliance Officer, and spoke with him in late October/early November 2005  to report concerns

with the manner in which the AWARE Trial and ACT Registry paperwork and patient enrollment

documents were completed. Based on that conversation, Relator understood that it was improper for

the sales force to fill in any information except identifiers such as facility name or patient's name on

the top of the forms; the physician or his staff needed to fill in the collected data, and the physician

was to sign as the investigator.

109.    Relator's co-workers disagreed with his understanding. Thereafter, Relator and other

members of the sales force attended a presentation called "Legal Minefield". After that presentation,

Relator contacted the presenter, Neal Williams, SJM Associate General Counsel, on November 15,

2005. Relator's meeting with Williams did not change his understanding. Relator's understanding

remained the same as after his conversation with Mr. Bae: that he should not fill out enrollment and

data collection forms even if the study center would sign the form—doing so would put the integrity

of the study data at risk. In other words, Relator's understanding was that neither he nor anyone else

---

[3]Prior to these media reports, there were reports beginning with an article in the New York Times on August 2, 2005,
followed by another NYT article on September 27, 2005, and an October 3, 2005 article in Washington Business
Information Inc.'s Devices & Diagnostics Letter.  These articles focused on Guidant, but also discuss SJM, and as to
both allege that they used post marketing evaluation studies to persuade doctors to use their devices. After the
October 2005 articles reporting on the subpoenas,, there are  later articles; these largely just report on the subpoenas
and prior media reports.  The last one of these articles pre Mr. Donigian's filing appears to be a March 25, 2006
NYT article; that article refers to allegations the companies use illegal inducements to get doctors to use their
products and provided doctors with excessive payments to enroll patients in post-marketing studies of their devices
as a way of increasing sales.

who was part of the sales force was to complete the ACT Registry or AWARE Trial patient enrollment documents, data collection forms, or implant information reports.

110.    Nevertheless, his supervisor, Doug Helm, SJM's Regional Sales Manager for the WCW area, continued to require Relator to complete the AWARE Trial and ACT Registry patient enrollment documents, data collection forms, and implant information reports. Other co-workers criticized Relator saying he was causing the company harm and saying words to the effect of "DOJ is going to see the e-mail and question what we were doing". Relator responded to the effect that "if what the company was doing was legal then there shouldn't be any issue."

111.    In December 2005, one of Relator's co-workers told Relator he was sending him some new forms they could properly fill out for the studies. Upon receipt, Relator noticed that the forms were the same as before, except there was not a place for signature by the physicians. Relator again contacted Mr. Williams. Thereafter, Relator understood that he could not fill out any forms the doctors agreed to submit as part of the research study agreement, the investigator's agreement, or the protocol.

112.    During this time Relator responded to an e-mail from Kevin O'Malley (from the SJM General Counsel's office) asking (routinely) if he knew of any SJM Policy violations; Relator checked yes. A reply e-mail said someone from the General Counsel would be in touch with the Relator if they had any questions. When no one followed up with Relator, he called SJM's hotline number and reported numerous of the violations alleged herein.

113.    In February 2006, Relator again contacted Mr. Bae to report concerns with the manner in which the AWARE Trial paperwork and patient enrollment documents were completed. At this

36

time and also in April 2006, Relator also reported incidents of retaliation by co-workers based on Relator's prior reports of compliance violations. In the interim, in March 2006, his supervisor Doug Helm gave him negative marks in his annual performance review because of his communications about the study paperwork and other kickbacks.

114.    Relator also reported to management the common use of improper and illegal kickbacks by the SJM sales force including the improprieties concerning the AWARE trial and ACT Registry. This included many of the kickbacks described herein.

115.    In May 2006, attorneys for AdvaMed (Reed & Smith) met with one of Relator's co-workers to discuss Relator's reported violations.

116.    While employed by DEFENDANT SJM, Relator repeatedly questioned, investigated, and reported internally and subsequently to appropriate Government officials (prior to filing this action), SJM's illegal practices.

117.    SJM failed and refused to change its policies and practices that obligated Relator to acquiesce in, or actively participate in, violations of Medicare and Medicaid compliance requirements and the Federal Anti-Kickback Law. That the actions of SJM of which Relator was complaining can constitute the basis for an FCA violation is confirmed by a press release issued December 23, 2009, by the United States Attorney's Office for the District of Massachusetts, in which DOJ announced that the Government had reached a $22 million civil settlement with Boston Scientific Corporation to resolve allegations that its subsidiary, Guidant Corporation, a competitor of SJM's, used post-market studies as vehicles to pay kickbacks to induce physicians to implant Guidant pacemakers and defibrillators. (This press release is a public record and can

37

be found on the U.S. Attorney's Office's website).

## FALSE CLAIMS

118.    In legitimate FDA registered, clinical trials, physicians do not bill the patients' insurance company (including Medicare or Medicaid) for the underlying physician services or products used. Similarly, products or pharmaceuticals used in legitimate FDA registered clinical trials are generally donated by the manufacturer; not billed to the patients' insurance company (including Medicare or Medicaid).

119.    As a result of DEFENDANT SJM's kickbacks to Health Care Professionals, as alleged above, SJM caused such HCPs to submit false and fraudulent claims to Government Health Care Programs or to make or use false records or statements material to false or fraudulent claims paid or approved by the Government. Examples of patients for whom such false claims and/or false statements were made are described above and also are listed in Exhibits 3 and 5.

120.    All claims for these specifically identified patients that were submitted to Medicare during and after the specifically identified kickbacks were paid by Defendant, are false claims. The Relator has further detailed information, including dates of service and patient information and forms, however, he does not believe it is appropriate to disclose such information in a to be public filing such as this Third Amended Complaint. He will file such information as deemed necessary by this Court and under such conditions as this Court believes to be appropriate. He will also produce such information in connection with his Fed. R. Civ. P. Rule 26 Initial Disclosures and pursuant to discovery subject to any necessary Protective Order.

## LEGAL CLAIMS FOR RELIEF

### Count I- Federal False Claims Act

121.    Relator realleges and incorporates by reference each allegation in each of the preceding paragraphs as though fully set forth herein.

122.    This is a claim by Relator, on behalf of the UNITED STATES OF AMERICA, for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729-3733, against SJM for knowingly causing to be presented false or fraudulent claims to Government Healthcare Programs for payment or approval, and/or for making, using, or causing to be made or used, a false record or statement material to false or fraudulent claims paid or approved by the Government. DEFENDANT'S misconduct has been ongoing for at least the past six years preceding the filing of Relator's original Complaint, in the District of Massachusetts and elsewhere throughout the United States through the date of Relator's constructive discharge from his employment in April 2007. The false records or statements were: (a) HCP's false certifications and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the AKA; and (b) false information or material omissions in study paperwork.

123.    DEFENDANT has made, used and/or caused to be made or used such false statements or records and has caused to be presented claims for payment or approval to the Government Healthcare Programs, knowing such statements or records were false and such claims were false or fraudulent.

124.    DEFENDANT knew that its marketing strategy of: (1) offering kickbacks to physicians and healthcare providers in the form of free equipment and other items, and cash

payments for phony clinical trials and phony clinical registries; and (2) providing lavish entertainment and other inducements, was in violation of the AKA, 42 U.S.C. §1320a-7b(b)(2)(A), including because its own written compliance materials prohibited same.

125. As a result of SJM's kickbacks to induce HCP's to purchase, order, or recommend or arrange for the purchasing or ordering of SJM's products, in violation of the AKA, all of the claims SJM caused HCP's to present to Government Health Care programs for those products are false or fraudulent.

126. By virtue of the false or fraudulent claims, records or statements that SJM caused to be presented, the UNITED STATES OF AMERICA has suffered actual damages and is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each false or fraudulent claim presented or caused to be presented and each false statement or record made, used or caused to be made or used.

WHEREFORE, Relator respectfully requests this Court to enter Judgment against DEFENDANT, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false or fraudulent claims and statements alleged within this Complaint, as the Federal Civil False Claims Act (FCA), 31 U.S.C. §§ 3729, *et seq.* provides;

(b)     That civil penalties of $11,000 be imposed under the FCA for each and every false or fraudulent claim or statement that DEFENDANT caused to be presented to the Government Healthcare Programs;

40

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorney's fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Relator be awarded the maximum amount allowed pursuant to the FCA;

### Count II- Retaliation – 31 U.S.C. § 3730(h)

127.   Relator realleges and incorporates by reference each allegation in each of the preceding paragraphs as though fully set forth herein.

128.   DEFENDANT SJM has a duty under the False Claims Act, to refrain from taking retaliatory actions against employees in violation of 31 U.S.C. § 3730(h).

129.   After reporting the common use of improper and illegal kickbacks by the SJM sales force as detailed above, SJM retaliated against Relator by failing to increase his compensation, failing to timely pay Relator's expense reimbursements, restricting Relator's sales territory, failing to consider Relator for an open sales representative position, providing him with a negative performance review, and tolerating threat of physical harm by co-workers at a Christmas party at Doug Helm's house in December 2006.

130.   The policies and practices of SJM required that Relator disregard, acquiesce in, or actively participate in, violations of Medicare and Medicaid compliance requirements and the federal Anti-kickback law, as a condition of employment and advancement within the company.

131.   Relator took lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section and, as such, engaged in protected activity under the False Claims Act and other laws

132.    While employed by DEFENDANT SJM, Relator repeatedly questioned, investigated, and reported internally and subsequently to appropriate Government officials, SJM's illegal practices.

133.    In retaliation for his efforts, while employed by SJM, DEFENDANT harassed, intimidated, and otherwise created a hostile work environment for Relator in retaliation for his objections to and reporting of SJM's wrongdoing and his investigation and other acts in furtherance of this action, without good cause.

134.    On or about April 9, 2007, Relator learned that SJM would not remedy its retaliatory conduct toward Relator, and would not change its policies and practices that obligated Relator to acquiesce in, or actively participate in, violations of Medicare and Medicaid compliance requirements and the Federal Anti-kickback Law, as a condition of employment and advancement within the company.

135.    Based on SJM's failure and refusal change its policies and practices that obligated Relator to acquiesce in, or actively participate in, violations of Medicare and Medicaid compliance requirements and the Federal Anti-Kickback Law as a condition of employment and advancement within the company, Relator correctly concluded that his future employment with the company would place him in legal jeopardy, and Relator further concluded that he could not reasonably be expected to subject himself to legal jeopardy as a condition of his employment.

136.    SJM constructively discharged Relator by requiring that Relator acquiesce in, or actively participate in, violations of Medicare and Medicaid compliance requirements and the Anti-Kickback Law as a condition of employment and advancement within the company, and by placing

Relator in legal jeopardy; and accordingly Relator notified SJM that his employment would terminate effective April 17, 2007, because SJM refused to address or correct the ongoing violations of Medicare and Medicaid compliance requirements.

137.    Immediately following Relator's resignation, SJM accelerated the termination of Relator's employment by removing him from his job duties effective April 9, 2007.

138.    Relator provided SJM a reasonable opportunity to resolve the ongoing violations of Medicare and Medicaid laws and regulations and the Anti-Kickback law, prior to submitting his resignation.

139.    The actions of DEFENDANT damaged and continue to damage Relator in violation of 31 U.S.C. § 3730(h), in an amount to be determined at trial.

140.    As a direct and proximate result of SJM's actions, Relator has been damaged through the loss of past and future wages and benefits.

141.    DEFENDANT'S conduct damaged Plaintiff by causing Plaintiff to suffer severe anxiety and depression that necessitated medical treatment and medication.

142.    DEFENDANT SJM acted maliciously and with wanton disregard for Plaintiff/Relator and his legal rights.

143.    Pursuant to 31 U.S.C. § 3730(h), Relator is entitled to damages, litigation costs and reasonable attorneys' fees incurred in the vindication of his reputation and the pursuit of his retaliation claims.

WHEREFORE, Relator respectfully requests this Court to enter Judgment against DEFENDANT, as follows:

(a)     That the Court award all proper damages in favor of Relator as a result of DEFENDANT'S conduct in violation of 31 U.S.C. § 3730(h) including two times back pay, front pay and loss of future earnings, attorneys fees, costs and expenses, and damages for emotional distress.

(b)     That this Court award such other and further relief as it deems proper, including without limitation pre and post judgment interest and punitive damages.

### Count III--State Of Missouri Wrongful Discharge

144.    Relator realleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

145.    Relator reported to management the common use of improper and illegal kickbacks by the SJM sales force including the improprieties concerning the AWARE trial.

146.    After reporting the common use of improper and illegal kickbacks by the SJM sales force, SJM retaliated against Relator by failing to increase his compensation, failing to timely pay Relator's expense reimbursements, restricting Relator's sales territory, giving him a negative performance review, failing to consider Relator for an open sales representative position and tolerating threat of physical harm by co-workers at a Christmas party at Doug Helm's house in December 2006.

147.    The policies and practices of SJM required that Relator disregard, acquiesce in, or actively participate in, violations of Medicare and Medicaid compliance requirements and the federal Anti-kickback law, as a condition of employment and advancement within the company.

148. Relator took lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section and, as such, engaged in protected activity under the False Claims Act and other laws

149. While employed by DEFENDANT SJM, Relator repeatedly questioned, investigated, and reported internally and subsequently to appropriate Government officials, SJM's illegal practices.

150. In retaliation for his efforts, while employed by SJM, DEFENDANT harassed, intimidated, and otherwise created a hostile work environment for Relator in retaliation for his objections to and reporting of SJM's wrongdoing and his investigation and other acts in furtherance of this action, without good cause.

151. On or about April 9, 2007, Relator learned that SJM would not remedy its retaliatory conduct toward Relator, and would not change its policies and practices that obligated Relator to acquiesce in, or actively participate in, violations of Medicare and Medicaid compliance requirements and the Federal Anti-kickback Law, as a condition of employment and advancement within the company.

152. Based on SJM's failure and refusal change its policies and practices that obligated Relator to acquiesce in, or actively participate in, violations of Medicare and Medicaid compliance requirements and the Federal Anti-Kickback Law as a condition of employment and advancement within the company, Relator correctly concluded that his future employment with the company would place him in legal jeopardy, and Relator further concluded that he could not reasonably be expected to subject himself to legal jeopardy as a condition of his employment.

45

153.    SJM constructively discharged Relator by requiring that Relator acquiesce in, or

actively participate in, violations of Medicare and Medicaid compliance requirements and the Anti-

Kickback Law as a condition of employment and advancement within the company, and by placing

Relator in legal jeopardy; and accordingly Relator notified SJM that his employment would

terminate effective April 17, 2007, because SJM refused to address or correct the ongoing violations

of Medicare and Medicaid compliance requirements.

154.    Immediately following Relator's resignation, SJM accelerated the termination of

Relator's employment by removing him from his job duties effective April 9, 2007.

155.    Relator provided SJM with an opportunity to remedy DEFENDANT'S unlawful

conduct and provided DEFENDANT with sufficient time to remedy its unlawful conduct, but

DEFENDANT failed to take corrective action and failed to alleviate the unlawful obligations and

expectations that DEFENDANT imposed on Plaintiff., prior to submitting his resignation.

156.    The actions of DEFENDANT damaged and continue to damage, in an amount to be

determined at trial.

157.    SJM's actions violated the public policy of the State of Missouri because Relator

objected to, and refused to participate in, acts by SJM that violate laws of the United States, and that

violate R.S.Mo. § 570.150.1 which prohibits acts of commercial bribery, and which establishes that

a person commits the crime of commercial bribery:

(1) If he solicits, accepts or agrees to accept any benefit as consideration for knowingly
violating or agreeing to violate a duty of fidelity to which he is subject as: (a) Agent or
employee of another . . . (d) Officer, director, partner, manager or other participant in the
direction of the affairs of an incorporated or unincorporated association;
(2) If as a person who holds himself out to the public as being engaged in the business of
making disinterested selection, appraisal or criticism of commodities or services, he solicits,
accepts or agrees to accept any benefit to influence his selection, appraisal or criticism;

46

(3) If he confers or offers or agrees to confer any benefit the acceptance of which would be criminal under subdivisions (1) and (2) of this section.

157.    As a direct and proximate result of SJM's actions, Relator has been damaged through the loss of past and future wages and benefits.

158.    DEFENDANT'S conduct damaged Plaintiff by causing Plaintiff to suffer severe anxiety and depression that necessitated medical treatment and medication.

159.    Relator is entitled to recover punitive damages from DEFENDANT because DEFENDANT SJM acted maliciously and with wanton disregard for Plaintiff/Relator and his legal rights, and punitive damages in an amount not less than $2,000,000.00 are necessary to deter DEFENDANT and others from similar conduct.

WHEREFORE, Relator respectfully requests this Court to enter Judgment against DEFENDANT, as follows:

(a)    That the Court award all proper damages in favor of Relator as a result of DEFENDANT'S conduct in violation of § 570.150.1 including actual damages, exemplary damages, attorneys fees, costs and expenses.

(b)    That this Court award such other and further relief as it deems proper, including without limitation pre and post judgment interest.

**PRAYERS FOR RELIEF**

Relator prays that the Court enter the relief requested above and such other relief as the Court deems appropriate and just.

**PLAINTIFF DEMANDS A JURY TRIAL**

47

Dated:  January 19, 2010

Respectfully submitted,

*Suzanne E. Durrell* mm

Suzanne E. Durrell
*DURRELL LAW OFFICE*
(Mass. BBO #139280)
180 Williams Avenue
Milton, Massachusetts 02186
(617) 333-9681
facsimile (617) 333-0014
email suzanne.durrell@verizon.net

*Robert M. Thomas, Jr.* mm

Robert M. Thomas, Jr.
(Mass. BBO #645600)
*THOMAS & ASSOCIATES*
280 Summer Street, 5th Floor
Boston, MA 02210-1131
(617) 371-1072
Fax: (888) 676-7420
Email: rmt@thomasandassoc.net

Kenneth J. Nolan (pro hac vice)
Marcella Auerbach (pro hac vice)
NOLAN & AUERBACH, P.A.
435 N. Andrews Avenue
Suite 401
Ft. Lauderdale, FL 33301
Phone: (954) 779-3943
Fax: (954) 779-3937
email: marcella@whistleblowerfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a true and correct copy of the foregoing Third Amended Complaint to be delivered via first class mail to counsel for each government Plaintiff on January 21, 2010.

*Suzanne E. Durrell* mm

Suzanne E. Durrell